IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HOLGER FIALLO and ANTOINETTE SUCHENKO,<br><br>                Plaintiffs,<br><br>v.<br><br>GROUPON, INC., a Delaware corporation,<br><br>                Defendant. | CIVIL ACTION<br><br>Case No. 19-CV-3986 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Holger Fiallo and Antoinette Suchenko, by and through undersigned counsel, seek a permanent injunction requiring a change in the corporate policies of Groupon, Inc. ("Defendant" or "Groupon") to cause the mobile[1] application it owns, maintains, and controls—Groupon (the "Application")—to comply with the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, (the "ADA") and to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiffs respectfully assert as follows:

**INTRODUCTION**

1.      Plaintiffs Holger Fiallo and Antoinette Suchenko are blind.[2] Because they are blind, Plaintiffs rely on accessibility software to access electronic information technology ("EIT"), such as applications on their mobile devices.

2.      All iOS and Android-based devices have built-in screen reader capabilities that

---

[1] "Mobile" is a generic term for a broad range of wireless devices that are easy to carry and use in a wide variety of settings. This letter relates to those mobile devices commonly referred to as smartphones and tablets, only. This letter does not concern desktop/laptop applications, wearable technology such as smart-watches, or household appliances.

[2] Plaintiffs use "blind" or "visually-impaired" to mean all individuals who meet the legal definition of blindness.

1

can be turned on by the user. However, these screen readers only work if EIT is designed to work with them, and most mobile applications presently are not.

3. As a result, visually impaired users often have difficulty navigating applications, filling out forms, and identifying the function or significance of links, buttons, and images. Likewise, hearing impaired individuals cannot perceive audio content of videos without captioning.

4. Screen reader technology "translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, No. 17-CV-767, 2017 WL 6542466 at *6 (E.D.N.Y. Dec. 21, 2017).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.
>
> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id*. at **6–7. *See also* American Federation for the Blind, *Screen Readers*, *available at* https://www.afb.org/blindness-and-low-vision/using-technology/assistive-technology-products/screen-readers (last accessed April 29, 2019) (discussing screen readers and how they work).

5. Defendant is a Delaware corporation with its principal place of business in Illinois. Groupon, Inc., owns, operates, and/or controls the Application.

6. Defendant is responsible for the policies, practices, and procedures concerning the Application's development and maintenance.

7. Unfortunately, Defendant denies the approximately 8.1 million Americans[3] who have difficulty seeing access to the Application's goods, content, and services because the Application is largely incompatible with the screen readers these Americans use to navigate an increasingly electronic world.

8. Plaintiffs bring this civil rights action against Defendant to enforce Title III of the ADA, 42 U.S.C. §§ 12181–12189 ("Title III"), which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of its services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

9. By failing to make its Application available in a manner compatible with computer screen reader programs, Defendant, a public accommodation subject to Title III, deprives blind and visually-impaired individuals the benefits of its online goods, content, and services—all benefits it affords nondisabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title III was meant to redress.

10. Because Defendant's Application is not and has never been accessible, and

---

[3] *See* Press Release, U.S. Census Bureau, *Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports*, available at https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html (last accessed April 29, 2019) ("About 8.1 million people had difficulty seeing, including 2.0 million who were blind or unable to see.").

because upon information and belief Defendant does not have, and has never had, an adequate corporate policy that is reasonably calculated to cause its Application to become and remain accessible, Plaintiffs seek a permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) requiring that:

    a.    Defendant retain a qualified consultant acceptable to Plaintiffs ("Accessibility Consultant") who shall assist it in improving the accessibility of its Application, including all third-party content and plug-ins, so the goods and services on the Application may be equally accessed and enjoyed by individuals with vision related disabilities;

    b.    Defendant work with the Accessibility Consultant to develop an internal "App Accessibility Policy" to ensure that any future versions of the Application, or any other applications owned, operated, or controlled by Defendant are accessible;

    c.    Defendant ensure that all employees involved in website and content development be given accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages;

    d.    Defendant work with the Accessibility Consultant to perform an automated accessibility audit on a periodic basis to evaluate whether the Application may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

    e.    Defendant work with the Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate,

browse, and conduct business on website, in addition to the testing, if applicable, that is performed using semi-automated tools;

  f.  Defendant incorporate all of the Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

  g.  Defendant provide a link from the initial or "home" screen within the Application to a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its Application to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Application;

  h.  Defendant accompany this public statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the App Accessibility Policy;

  i.  Defendant provide, within the public statement described in Paragraph 10.g., a notice soliciting feedback from users of the Application on how the accessibility of the Application can be improved. The notice shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the App Accessibility Policy;

  j.  Defendant provide a copy of the App Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Application;

  k.  Defendant train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the

Application. Defendant shall have trained no fewer than three of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

  l. Defendant modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Application to be inaccessible to users of screen reader technology;

  m. Plaintiffs, their counsel, and their experts monitor the Application for up to two (2) years after the Accessibility Consultant validates the Application is free of accessibility errors/violations to ensure Defendant has adopted and implemented adequate accessibility policies. To this end, Plaintiffs, through their counsel and their experts, shall be entitled to consult with the Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Accessibility Consultant provides Defendant.

  11. Mobile applications have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible application may not cause the application to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible application has been rendered accessible, and whether corporate policies related to mobile applications have been changed in a meaningful manner that will cause the application to remain accessible, the application must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

## JURISDICTION AND VENUE

12. The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

13. Defendant is subject to general personal jurisdiction in this Court because its principal place of business is in Illinois. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).

14. Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred.

## PARTIES

15. Plaintiff Fiallo is, and at all times relevant hereto has been, a resident of Chicago, Illinois. Plaintiff Fiallo is, and at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

16. Plaintiff Suchenko is, and at all times relevant hereto has been, a resident of the Commonwealth of Pennsylvania. Plaintiff Suchenko is, and at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

17. Defendant is a Delaware corporation with its principal place of business at 600 W Chicago Ave, Chicago, Illinois 60654.

## FACTS APPLICABLE TO ALL CLAIMS

18. While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, application and content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with

disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

## DEFENDANT'S APPLICATION CONTENT

19. Defendant's Application purportedly enables consumers to "save up to 70% on the things you need every day."[4] Once they have downloaded the Application to their mobile device, consumers may browse, view, and research products and services available locally and over the internet. Consumers may ultimately purchase products and services directly through the Application.

20. The Application also enables consumers to contact customer service by phone, email, and instant messenger, review important legal notices like Defendant's Privacy Policy and Terms and Conditions, and more.

## HARM TO PLAINTIFFS

21. Plaintiff Fiallo attempted to access the Application using an iPhone XS from his home in Chicago, Illinois. Unfortunately, because of Defendant's failure to build its Application in a manner that is compatible with the screen reader program on his mobile device, Plaintiff Fiallo was unable to understand, and thus was denied the benefit of, much of the content and services he wishes to access with the Application.

22. Plaintiff Suchenko attempted to access the Application using an iPhone 6 from her home in Pennsylvania. Unfortunately, because of Defendant's failure to build its Application in a manner that is compatible with the screen reader program on her mobile device, Plaintiff Suchenko was unable to understand, and thus was denied the benefit of, much of the content and services she wishes to access with the Application.

---

[4] *See* Apple, *Groupon App Store Preview*, available at
https://itunes.apple.com/us/app/groupon/id352683833?mt=8

23. Unfortunately, as a result of using Defendant's Application, and from investigations performed on their behalf, Plaintiffs Fiallo and Suchenko found Defendant's Application to be largely unusable due to various barriers that deny them full and equal access to Defendant's electronic content and services. For example, Plaintiff Suchenko reported that:

    a. Defendant's Application does not function properly with mobile screen reader technology, preventing visually impaired consumers who are unable to see links or user-interface items from navigating using the screen reader.



In the Application, for instance, the menu "hamburger" in the picture above is unable to be activated by the iOS screen reader. This makes it extremely difficult for Plaintiffs and others with visual disabilities to navigate the Application.

b.   In addition, Plaintiff Fiallo reported that the Application "traps" users on a payment page, as visually-impaired users are unable to navigate away from the page without tapping on the screen.

c.   Plaintiff Suchenko further reported that Defendant's Application also does not present content to screen readers sequentially. Users who perceive content visually are able to view elements in an application—such as alerts or dialog boxes—with both text and images and to thus place them into context within the application. Thus, because Plaintiffs cannot perceive these visual images and text, they rely on screen readers to tell what is on the screen. Unfortunately, Defendant's Application does not present content in a meaningful order, making it difficult to navigate with a screen reader.



In the above screenshot, the alert message is not presented in a meaningful order: the screenreader reads the email address field and then the heading of the alert message.

        d.      In addition, Plaintiff Fiallo reported that the Application fails to adequately describe the purpose of all headings and button labels. As a result, blind users will have significant difficulty understanding what information is contained on pages and how that information is organized. When headings and labels are clear and descriptive, users can find information they seek more easily, and they can understand the relationships between different pieces of content. As a result, because there is no text, screen readers have nothing to read.



For example, when a screen reader comes to the payment page as it appears above, there

is no name defined for the Credit Card number field, which could leave a visually-impaired user unsure of what this element is for. As a result, visually-impaired individuals could be unable to properly input their payment information, making them unable to purchase the goods and services provided by Defendant's Application.

      e.      In addition, Plaintiff Suchenko reported that the Application fails to ensure that foreground, background, and/or text color combinations provide sufficient contrast. There are nearly three times more individuals with low vision than those with total blindness; and one out of twelve people has some sort of color deficiency. These users encounter difficulty distinguishing text or interface objects from a background color if the contrast is insufficient.

24.     These barriers, and others, deny Plaintiffs and others like them full and equal access to all of the services the Application offers, and now deter them from attempting to use the Application. Still, Plaintiffs would like to, and intend to, attempt to access the Application in the future to experience the content and services the Application offers, or to test the Application for compliance with the ADA.

25.     If the Application were accessible, *i.e.* if Defendant removed the access barriers described above, Plaintiffs could independently review and purchase Defendant's products and access its other online content and services.

26.     Though Defendant may have centralized policies regarding the maintenance and operation of the Application, Defendant has never had a plan or policy that is reasonably calculated to make the Application fully accessible to, and independently usable by, individuals with vision related disabilities. As a result, the complained of access barriers are permanent in nature and likely to persist.

27. The law requires that Defendant reasonably accommodate Plaintiffs' disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

28. Plaintiffs have been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and services in a manner that is compatible with screen reader technology.

### DEFENDANT'S KNOWLEDGE OF APPLICATION ACCESSIBILITY REQUIREMENTS

29. Defendant has long known that screen reader technology is necessary for individuals with visual disabilities to access its online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

30. Indeed, the "Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago." As described above, on September 25, 2018, Assistant Attorney General Stephen E. Boyd confirmed that nothing about the ADA, nor the Department's enforcement of it, has changed this interpretation.

31. There is nothing to suggest that the ADA does not similarly apply to mobile applications developed by public accommodations.

### PLAINTIFFS HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE

32. There is no DOJ administrative proceeding that could provide Plaintiffs with Title III injunctive relief.

33. While the DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Plaintiffs with relief.

34. Plaintiffs allege violations of existing and longstanding statutory and regulatory

requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

35. Resolution of Plaintiffs' claims do not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Defendant offers content and services in the Application, and (b) whether Plaintiffs can access the content and services.

## COUNT I – SUBSTANTIVE VIOLATION
## Title III of the ADA, 42 U.S.C. § 12181 *et seq.*

36. The assertions contained in the previous paragraphs are incorporated by reference.

37. Defendant's Application is a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See Doe v. Mutual of Omaha Insurance Co.*, 179 F.3d 557, 559 (7th Cir. 1999) (public accommodation includes "the owner or operator of a …Web site, or other facility (*whether in physical space or in electronic space* ) that is open to the public…"); *see also Andrews v. Blick Art Materials, Inc.*, 268 F. Supp. 3d 381, 393 (E.D.N.Y. 2018) ("It is unambiguous that under Title III of the ADA, dickblick.com is a place of public accommodation."); *Del-Orden v. Bonobos, Inc.*, No. 17-CV-2744, 2017 WL 6547902 at *7 (S.D.N.Y. Dec. 20, 2017) ("A commercial website itself qualifies as a place of "public accommodation" to which Title III of the ADA affords a right of equal access.");.

38. In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Defendant does not provide Plaintiffs with full and equal access to the Application, it has violated the ADA.

39. In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or

otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

40. Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service, or fails to provide a like experience to the disabled person.

41. Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

42. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time: as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

43. By failing to provide the Application's content and services in a manner that is compatible with auxiliary aids, Defendant has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

    a.    denying individuals with visual disabilities opportunities to participate in

15

and benefit from the goods, content, and services available in the Application;

  b. affording individuals with visual disabilities access to the Application that is not equal to, or effective as, that afforded others;

  c. utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

  d. denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

  e. failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

44. Defendant has violated Title III by, without limitation, failing to make the Application's services accessible by screen reader programs, thereby denying individuals with visual disabilities the benefits of the Application, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

45. Defendant has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow the Application to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

46. Making its online goods, content, and services compatible with screen readers does not change the content of Defendant's Application or result in making the Application different, but enables individuals with visual disabilities to access the Application Defendant already provides.

47. Defendant's ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiffs and other individuals with visual disabilities.

48. Plaintiffs' claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

49. Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiffs requests relief as set forth below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Holger Fiallo and Antoinette Suchenko respectfully request that this Court issue an order:

A. Declaring that Defendant's actions, as described herein, constitute violations of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that the Application is fully accessible to, and independently usable by, individuals with visual disabilities;

B. A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring the Application into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that the Application is fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law—the specific injunctive relief requested by Plaintiffs is described more fully in paragraph 10 above;

C. Payment of actual, statutory, and punitive damages, as the Court deems proper;

    D.      Payment of costs of suit;

    E.      Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance[5] with the judgment;

    F.      Whatever other relief the Court deems just, equitable and appropriate; and

    G.      An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders.

Respectfully Submitted,

**HOLGER FIALLO** and **ANTOINETTE SUCHENKO**, individually and on behalf of all others similarly situated,

Dated: June 13, 2019

By:  s/ Adam C. York
    One of Plaintiff's Attorneys

Michael Aschenbrener (6292306)
masch@kamberlaw.com
Adam C. York (6294143)
ayork@kamberlaw.com
KamberLaw LLC
220 N Green St
Chicago, IL 60607
Tel: 212.920.3072
Fax: 212.202.6364

Benjamin J. Sweet
ben@sweetlawpc.com
**THE SWEET LAW FIRM, P.C.**
186 Mohawk Drive
Pittsburgh, PA 15228
Phone: (412) 742-0631

---

[5] *See Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976 (D. Mass. Apr. 17, 2018) (ECF 11) ("Plaintiffs, as the prevailing party, may file a fee petition before the Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), and *Garrity v. Sununu*, 752 F.2d 727, 738-39 (1st Cir. 1984), the fee petition may include costs to monitor Defendant's compliance with the permanent injunction."); *see also Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 16-CV-01898 (W.D. Pa. Jan. 11, 2018) (ECF 191) (same)